1
2
3
4
**UNITED STATES DISTRICT COURT**
5
**DISTRICT OF NEVADA**
6
\* \* \*
7
L.M., *et al.*,
8
                    Petitioners,                     Case No. 2:25-cv-02194-RFB-BNW
9
          v.                                         **ORDER GRANTING PRELIMINARY**
                                                     **INJUNCTION**
10
KRISTI NOEM, *et al.*,
11
                    Respondents.
12
13
          Before the Court is Petitioners L.M., V.M., and R.L.'s ("Petitioners'")[1] (ECF No. 2)
14
Motion for a Temporary Restraining Order or in the alternative, Preliminary Injunction. For the
15
following reasons, the Court grants the Motion and issues a preliminary injunction ordering
16
Respondents to immediately release Petitioners from detention, pending resolution on the merits
17
of their Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241.
18
19
**I.    INTRODUCTION**
20
          Petitioners are three noncitizens who were paroled into the United States in 2024 after
21
successfully applying for parole through the mobile device application launched by U.S. Customs
22
and Border Protection (CBP) called CBP One.[2] See Pet'rs' Verified Pet., ECF No. 1 at 8, 10, 11.
23
          _____
24
          [1] The Court has granted Petitioners' leave to proceed pseudonymously. See ECF No. 21.
25
          [2] In October 2021, Customs and Border Enforcement ("CBP") launched CBP One: a
26
mobile application that "provides travelers with access to certain CBP functions prior to their
arrival in the United States." CBP One: An Overview, Am. Imm. Council (March 2025),
https://www.americanimmigrationcouncil.org/wp-
27
content/uploads/2025/04/cbp_one_an_overview_0325.pdf, [https://perma.cc/Z5Y9-68ET]. Under
the Biden Administration, it was expanded such that immigrants "without entry documents could
28
schedule appointments at designated points of entry on the southern border." Id. In March 2023,

They were never detained. Id. Rather, pursuant to 8 U.S.C. § 1182(d)(5), they were paroled into the country for two years for the humanitarian purpose of applying for asylum in their removal proceedings. Id.

On May 20, 2025, Petitioners showed up to scheduled hearings in their removal proceedings at the Las Vegas Immigration Court. Id. at 12. At their hearings, the Department of Homeland Security (DHS) orally moved to dismiss their removal proceedings pursuant to 8 C.F.R. § 1239.2(c) and 8 C.F.R. 239.2(a)(7) based on a purported determination that it was no longer in the government's interest to pursue removal proceedings. Id. The assigned immigration judge (IJ) granted the government's motions and dismissed each of Petitioners' removal proceedings without prejudice. Id. Before Petitioners could leave the building, Immigrations and Customs Enforcement (ICE)—an agency within DHS—officers arrested and detained them. DHS then placed them in expedited removal proceedings under 8 U.S.C. § 1225(b)(1). Id. at 4. This was consistent with a nationwide DHS policy that was stayed by the United States District Court for the District of Columbia on August 1, 2025, as exceeding DHS' statutory and regulatory authority, *i.e.* ultra vires, and arbitrary and capricious under the Administrative Procedures Act (APA). See Coal. for Humane Immigrant Rts. v. Noem, --- F. Supp. 3d. ---, No. 25-CV-872 (JMC), 2025 WL 2192986 (D.D.C. Aug. 1, 2025). The decision stayed DHS' policy "as to all noncitizens who have been, at any point in time, paroled into the United States at a port of entry." Id. at *2.

Petitioners timely appealed the dismissal of their removal proceedings to the Board of Immigration Appeals (BIA) in June of 2025. Pet'rs' Verified Pet., ECF No. 1 at 12-13. In August, pursuant to the order of the D.C. District Court, they were returned to regular removal proceedings "as initiated by the previously dismissed NTAs" after a joint motion to remand their cases was filed with the BIA by ICE Enforcement and Removal Operations and ICE Office of the Principal Legal Advisor (OPLA). Id. at 13-14. They have been detained at the Nevada Southern Detention

---

CBP One became "the primary method by which asylum seekers could enter the United States at ports of entry." Id. If an asylum seeker entered the United States without an appointment, they were deemed ineligible for asylum. See id. The Trump Administration has since terminated CBP One. See id.; see also U.S. Customs and Border Protection, CBP Removes Scheduling Functionality in CBP One™ App, Natl. Media Release (Jan. 21, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app [https://perma.cc/XJF9-HJZ5].

Center (NSDC) in ICE custody since their original arrest in May, for nearly eight months. Id. at 1.

Petitioners bring this habeas challenge pursuant to 28 U.S.C. § 2241 challenging the lawfulness of their ongoing detention under the Due Process Clause of the Fifth Amendment and APA. Id. They assert that their detention is unlawful because: (1) their parole status is still active, due to Respondents failure to revoke their parole consistent with statutory and regulatory requirements; (2) Respondents are depriving them of their liberty without any process at all, in violation of their due process rights under the Fifth Amendment; and (3) any purported revocation of parole by DHS was arbitrary and capricious under the APA. See id.; see also Pet'rs' P&A in Supp. of Mot. for TRO or Prelim. Inj., ECF No 2-1.

For the reasons discussed below, because the Court finds Petitioners have established a likelihood of success on the merits of their claim that the purported revocation of their parole and their ongoing detention is unlawful under the APA and Due Process Clause, that their detention is causing them irreparable harm, and that the balance of equities tip sharply in their favor, the Court grants the Motion for Preliminary Injunction and orders Respondents to immediately release them from custody subject to the conditions of their previously granted parole. The Court further enjoins Respondents from re-detaining Petitioners during the pendency of their current removal proceedings without leave of Court.

## II.    PROCEDURAL HISTORY

The Court recites the procedural history relevant to the instant Motion. On November 6, 2025, Petitioners filed their Verified Petition for Writ of Habeas Corpus ("Petition"). See ECF No. 1. On November 11, 2025, Petitioners filed their instant Motion for Temporary Restraining Order or Preliminary Injunction. See ECF No. 2. On November 24, 2025, Respondents filed their Opposition to the Motion. See ECF No. 16. The same day, the Court held a hearing on the Motion. See ECF No. 17.

At the hearing, Petitioners maintained that they had not received written notice of their parole revocation, while counsel for Respondents argued that Petitioners had "admitted" to receiving a mass email that informed them their parole was revoked, and that the mass email

satisfied the regulatory requirement of written notice to Petitioners. See id. Respondents' counsel's claim that Petitioners made such an admission was based on a portion of Petitioners' briefing that referenced a mass email which was the subject of another case. See ECF No. 2-1 at 15–16. Petitioners' counsel clarified at the hearing that the reference to the email was a summary of the facts of Y-Z-L-H v. Bostock, 792 F. Supp. 3d 1123 (D. Or. 2025). See ECF No. 17. Accordingly, the Court ordered Respondents to provide, by November 26, 2025, evidence of any written notice that was issued to Petitioners regarding the termination of their parole statuses, including a written explanation regarding how the notice was distributed to Petitioners. See id. The Court further provided that if Respondents required additional time to comply with the Order, they should file a status report indicating the reasons additional time was needed. See id.

On November 26, 2025, Respondents refiled their (ECF No. 16) Opposition to the instant Motion, docketed as a "Status Report." See ECF No. 18. The only evidence attached to Respondents' filing was the Form I-862 Notices to Appear that were issued to each Petitioner upon their entry into the country. See ECF Nos. 18-1, 18-2, 18-3. The same day, Petitioners' counsel filed a supplemental pleading recounting his conversation with Petitioners after the November 24, 2025 hearing, wherein he sought to confirm with Petitioners that they had not received written notice of parole revocation as stated in their Petition, briefing, and at the hearing. See ECF No. 19. Counsel described a phone conversation with Petitioner L.M. wherein L.M. stated that he recalls receiving what he believed to be a mass email on or about April 16, 2025, when he was *pro se*, stating his parole ended and that he had 30 days to exit the country. Id. L.M. found the email confusing due to his scheduled hearing on May 20, 2025 before the Las Vegas Immigration Court wherein he planned to pursue his asylum application. See id. He does not otherwise recall the contents of the email. Id. Despite making efforts, due to Petitioner L.M.'s detained status, he and his counsel were unable to obtain a copy of that email. See id. Petitioners' counsel noted "Respondents are in a better position than Petitioner to provide this documentation and have not done so despite having been given the opportunity." Id. To date, Respondents have provided no evidence of any form of written notice sent to Petitioners regarding the revocation of their parole.

///

- 4 -

III.    **BACKGROUND**

A.  **Legal Background – Parole Under 8 U.S.C. § 1182(d)(5) and its Implementing Regulations**

"Immigration authorities at ports of entry have historically exercised the authority to parole [noncitizens] into the United States for various limited purposes." Vazquez Romero v. Garland, 999 F.3d 656, 660 (9th Cir. 2021) (citations omitted). Their "historical parole authority has been codified in § 1182(d)(5)." Id. (citing 8 U.S.C. § 1182(d)(5)(A)). That provision, titled "Temporary admission of nonimmigrants," provides:

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only *on a case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien[3] applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and *when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served* the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A) (emphasis added).

Based on the statute's operative regulations, a noncitizen's parole status ends in one of two ways. Parole automatically terminates (i) upon the noncitizen's "departure from the United States," or (ii) "at the expiration of the time for which parole was authorized." See 8 C.F.R. § 212.5(e)(1). Otherwise, DHS can terminate it prior to its expiration date "on notice" "*upon accomplishment of the purpose for which parole was authorized* or when in the opinion of one of the officials listed in paragraph (a) of this section,[4] *neither humanitarian reasons nor public benefit warrants the continued presence of the alien* in the United States *upon written notice* to the alien and he or she shall be restored to the status that he or she had at the time of parole." Id., § 212.5(e)(1)(i) (emphasis added). The regulation further provides that if any "exclusion, deportation, or removal order" as to the noncitizen "cannot be executed within a reasonable time, the alien shall again be

---

[3] An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). The Court uses the term "noncitizen" as synonymous of the statutory term "alien."

[4] 8 C.F.R. § 212.5(a) lists officials to whom the Secretary of Homeland Security can delegate her parole authority.

released on parole unless in the opinion of the official listed in paragraph (a) of this section the public interest requires that the alien be continued in custody." Id.

"The requirement of written notice is the only safeguard, for both the alien and the United States government, that parole status is administered in an orderly manner." United States v. Lagarda-Aguilar, 617 F.2d 527 (9th Cir. 1980) (citing regulations implementing 8 U.S.C. § 1182(d)(5) (1976) with an identical "upon written notice to the alien" requirement). DHS must provide written notice to a noncitizen to prematurely terminate their parole status. See id. ("We [ ] hold that written notice is essential to effectuate a termination [of parole].").

### B. Factual Background

The Court makes the following findings of fact relevant to Petitioners based on the undisputed factual assertions in the Verified Petition, the evidence supplied by Petitioners and Respondents, and the hearing on the instant Motion. See infra Part IV.A (describing the fact-finding process in habeas proceedings).

#### 1. Petitioner L.M.

Petitioner L.M. fled his home country of Ecuador due to persecution, which he fears was based on his sexual orientation, after masked assailants attempted to violently kidnap him and, while he was in hiding, his closest friends were murdered in a similar way to his attempted kidnapping. Pet'rs' Verified Pet., ECF No. 1 at 8. On March 12, 2025, he applied through the CBP One App and was granted temporary parole into the U.S. for humanitarian purposes. Id. at 8-9. His parole was set to expire on March 11, 2026. Id. at 8. On the date of his entry, he was also issued a DHS Form I-862 Notice to Appear for standard removal proceedings before an immigration judge in New York on May 1, 2025. Id. After successfully seeking a change of venue for his removal proceedings due to his residence in Las Vegas, he received a notice to appear for a master calendar hearing before the Las Vegas Immigration Court on May 20, 2025. Id. at 8-9.

Leading up to his detention, L.M. worked in the culinary field at a casino on the Las Vegas Strip. His job remains available if he returns to it within one year. Id. at 9. He had no interactions with police or the criminal justice system. Id. He also attempted to file for asylum, withholding of removal, and protection under the Convention Against Torture by filing a pro se I-589 form ("I-

589 Application"). <u>Id.</u> The form was rejected for failure to attach proof of service, and he is in the process of refiling. <u>Id.</u>

Petitioner L.M. recalls receiving a mass email on or about April 16, 2025, saying his parole ended and that he had 30 days to exit the country. ECF No. 19 at 2. The email was confusing to him due to his scheduled hearing before the Las Vegas Immigration Court where he planned to pursue his asylum case. <u>Id.</u> Neither L.M. nor his counsel have been able to obtain a copy of the email despite their efforts to do so. <u>Id.</u> To date, Respondents have failed to provide proof of any such email, or any other written notice sent to L.M. despite having been provided the opportunity to do so. <u>See</u> ECF Nos. 17, 18.

On the date of his hearing, May 20, 2025, the Las Vegas Immigration Court dismissed L.M.'s removal proceedings, and he was arrested and detained as he attempted to leave the courthouse. Pet'rs' Verified Pet., ECF No. 1 at 9. He timely appealed the dismissal of his removal proceedings to the BIA, <u>id.</u> at 12-13, and after the D.C. District Court's decision in <u>Coal. for Humane Immigrant Rts.</u>, 2025 WL 2192986, counsel for the DHS agreed to proceed with his removal proceedings as they were initiated in 2024 by the Form I-862 Notice to Appear. <u>Id.</u>

In July of 2025, L.M. filed a *pro se* motion for bond with the Immigration Court, which on August 13, 2025, an Immigration Judge denied for lack of jurisdiction. <u>Id.</u> at 13.

### 2. Petitioner V.M.

Petitioner V.M. fled his home country of Venezuela due to persecution, including threats to his life, based on his political activities. <u>Id.</u> at 10. He entered the United States on October 29, 2024, when he was granted parole for humanitarian purposes with an expiration date of October 28, 2026. <u>Id.</u> He was issued a Form I-862 Notice to Appear for standard removal proceedings before the Las Vegas Immigration Court on May 20, 2025. <u>Id.</u>

Leading up to his detention, V.M. developed ties to the community in Las Vegas through his sibling who resides there. <u>Id.</u> He worked in an auto mechanic shop until his work permit was revoked, but he was promised the ability to return to his job upon receipt of employment authorization. <u>Id.</u> He had no interactions with law enforcement or the criminal justice system. <u>Id.</u> at 10-11. He filed his I-589 Application on April 15, 2025. <u>Id.</u>

On the date of his hearing, May 20, 2025, the Las Vegas Immigration Court dismissed his removal proceedings, and he was arrested and detained. Id. at 11. He timely appealed the dismissal of his case to the BIA. Id. at 12-13. His removal proceedings were reopened after he was taken out of expedited removal proceedings, and he remains detained at NSDC during the pendency of those proceedings. Id. at 13-14.

### 3. Petitioner R.L

Petitioner R.L fled his home country of Cuba due to persistent persecution he faced due to his sexual orientation. Pet'rs' Verified Pet., ECF No. 1 at 11. He entered the United States on June 7, 2024, when he was granted parole for humanitarian purposes with an expiration date of June 6, 2026. Id. He was issued a Form I-862 Notice to Appear for standard removal proceedings before the Houston Immigration Court on June 24, 2025. Id. at 11-12. After filling a notice of change of address and motion to change venue because he had moved to Las Vegas, he received a notice of a hearing on May 20, 2025 before the Las Vegas Immigration Court. Id.

Leading up to his detention, R.L. lived with a close family friend and developed ties to the community in Henderson, Nevada. Id. at 12. He had no interactions with law enforcement or the criminal justice system. Id. He filed his I-589 Application on or about May 16, 2026. Id.

On the date of his hearing, May 20, 2025, the Las Vegas Immigration Court dismissed his removal proceedings, and he was arrested and detained. Id. at 12-13. He timely appealed the dismissal of his case to the BIA. Id. at 13-14. His removal proceedings were reopened after he was taken out of expedited removal proceedings, and he remains detained at NSDC during the pendency of those proceedings. Id.

### 4. DHS' Failure to Provide Written Notice of Termination of Parole to Petitioners

On March 25, 2025, DHS entered a notice in the Federal Register entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans." 90 Fed. Reg. 13611-01 (hereinafter "The CHNV Notice"), in response to a January 20, 2025, Executive Order by President Trump instructing the Secretary of Homeland Security to, consistent with applicable law, "[t]erminate all categorical parole programs that are contrary to the policies of the United States

established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'" Id. at 13611 (quoting Securing Our Borders, 90 Fed. Reg. 8467) (alterations in original). The CHNV Notice provided that individuals who received parole through the CHNV parole program between October 19, 2022 and January 22, 2025, and whose parole had not yet naturally expired, would have their parole revoked within 30 days. Id. at 12618-19. DHS stated it set a 30-day parole termination date in the interest of preserving its ability "to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population to prevent further straining of the over-burdened immigration court system." Id. at 13620.

The CHNV Notice also claimed "[t]his Federal Register notice serves as notice of the termination of the CHNV parole programs and satisfies the requirement that DHS provide written notice upon the termination of parole . . . DHS has determined that publication of this notice in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." Id. (citing 8 C.F.R. 212.5(e)(2)(i)) (citations omitted). The CHNV Notice also claimed "[b]ecause all CHNV parolees should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account." Id. (citing 8 C.F.R. § 103.2(b)(19)(ii)(B)). However, the regulation cited by DHS only contemplates electronic notice to "[r]epresented applicants or petitioners." 8 C.F.R. § 103.2(b)(19)(ii). The regulation specifically provides that USCIS would send "[u]nrepresented applicants or petitioners" "original notices" "directly to the applicant or petitioner." Id., § 103.2(b)(19)(i). Petitioners were each unrepresented at the time their parole was purportedly revoked and received notices regarding their immigration proceedings via mail or in person. See Pet'rs' Verified Pet., ECF No. 1 at 8-12 ; ECF No. 1-2 at 11–12 (Notice of In-Person Hearing to Petitioner L.M., with certificate of service by mail); Id. at 42–44 (Notice to Appear to Petitioner V.M, with certificate of service in person); Id. at 104 (Notice of In-Person Hearing to Petitioner L.R. with certificate of service via mail). Accordingly, the Court finds from the record before it that Petitioners did not receive electronic notice of the termination of their parole via a USCIS online account.

As Respondents appear to concede, even if the Court were to conclude that the CHNV Notice constituted sufficient constructive written notice to parolees under the CHNV program (which, as discussed below, the Court rejects), only Petitioners V.M., a citizen of Venezuela, and R.L., a citizen of Cuba, are parolees under the CHNV program. See Resp't' Opp'n, ECF No. 16 at 7 (stating that the CHNV Notice only terminated parole "for illegals from Cuba, Haiti, Nicaragua, and Venezuela, just like V.M. and R.L" while omitting reference to L.M., who is a citizen of Ecuador and whose parole was therefore not contemplated in the CHNV Notice). Respondents have not pointed to a notice in the federal register regarding Petitioner L.M.'s parole.

In their Opposition to the instant Motion, Respondents claim "[i]n April 2025, DHS began sending out parole termination notices to individuals who had been paroled at [ports of entry] after scheduling appointments for inspection using the CBP One App." Id. at 6. However, to date, Respondents have failed to provide *any evidence* that any such notice was sent to Petitioners, despite having been ordered to do so. See ECF Nos. 17, 18.

As discussed above, the only indication that Petitioner L.M. received written notice of his parole being revoked is based on his memory of receiving a mass email on or about April 16, 2026, which he is now unable to access, and which Respondents' have failed to provide to the Court, despite being in the best position to do so, given Petitioner L.M.'s detained status. See ECF No. 19. Petitioners V.M. and R.L. never received written notice of the termination of their parole of any kind. See Pet'rs' Verified Pet., ECF No. 1 at 26 ("[N]one of the Petitioners received written notice that their parole was being terminated early. Unlike Y-Z-L-H, which at least noted that a mass email satisfied the written notice part of termination requirements, Petitioners did not even get that.") (citing Y-Z-L-H v. Bostock, 792 F. Supp. 3d 1123 (D. Or. 2025)). Due to Respondents' failure to proffer evidence of any email sent to L.M., the Court cannot evaluate the adequacy of any such email as satisfying the written notice requirement under 8 CFR 212.5(e)(2)(i)). Given that, according to Respondents, the purported email was pursuant to the CHNV Notice, the Court finds that the email described by L.M. could not have constituted adequate notice to Petitioner L.M. in any event, because he is not a parolee under the CHNV Program, as a citizen of Ecuador— therefore the mass email he received was likely sent to him in error.  Indeed, this type of error is

1    precisely the reason that due process requires written notice, and a pre-deprivation hearing is

2    required in these particular circumstances. See infra Part V.B.2.

3         Accordingly, the Court finds from the record at this stage that no written notice regarding

4    the termination of their parole was sent to Petitioners.

5

## IV.    LEGAL STANDARDS

### A.    28 U.S.C. § 2241 Habeas Proceedings

8         The Constitution guarantees the writ of habeas corpus "to every individual detained within

9    the United States." Hamdi v. Rumsfeld, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art. I, § 9,

10   cl.2). "Its province, shaped to guarantee the most fundamental of all rights, is to provide an

11   effective and speedy instrument by which judicial inquiry may be had into the legality of the

12   detention of a person." Carafas v. LaVallee, 391 U.S. 234, 238 (1968) (citations omitted).

13   Historically, "the writ of habeas corpus has served as a means of reviewing the legality of

14   Executive detention, and it is in that context that its protections have been strongest." I.N.S. v. St.

15   Cyr, 533 U.S. 289, 301 (2001) (citations omitted). Accordingly, this Court has jurisdiction to grant

16   writs of habeas corpus to noncitizens who are being detained "in violation of the Constitution or

17   laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); see also Lopez-Marroquin v. Barr,

18   955 F.3d 759, 759 (9th Cir. 2020) ("[D]istrict courts retain jurisdiction under 28 U.S.C. § 2241 to

19   consider habeas challenges to immigration detention . . . .").

20        Although habeas corpus is "civil in nature[,] and the petitioner bears the burden of proving

21   that his detention is illegal[,]" Carlson v. Landon, 186 F.2d 183, 188 (9th Cir. 1950), the mechanics

22   of habeas proceedings are unique. See Harris v. Nelson, 394 U.S. 286, 294–95 (1969). When a

23   court confronts a viable habeas petition, it must either award the writ or order respondent(s) to

24   show cause—i.e., to "make a return certifying the true cause of [ ] detention." 28 U.S.C. § 2243;

25   see also Harris, 394 U.S. at 298–99 (citation omitted). Since habeas petitions must be verified, see

26   28 U.S.C. § 2242, their undisputed factual allegations should be taken at face value. See Carlson,

27   186 F.2d at 188 (quoting Whitten v. Tomlinson, 160 U.S. 231, 242 (1895)) (citations omitted).

28   "Where specific allegations before the court show reason to believe that the petitioner may, if the

facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." Harris, 394 U.S. at 300. Similarly, the certified, undisputed allegations of respondent(s) should also be accepted as true unless they are contradicted by relevant evidence. See Carlson, 186 F.2d at 188. Importantly, however, a detained habeas petitioner should "not be burdened by the impossible task of imagining and refuting [the] causes" of his detention. Id. As the Supreme Court "has emphasized, taking into account the office of the writ and the fact that the petitioner, being in custody, is usually handicapped in developing the evidence needed to support in necessary detail the facts alleged in his petition, that a habeas corpus proceeding must not be allowed to founder in a 'procedural morass.'" Harris, 394 U.S. at 291–92 (citation omitted).

### B. Preliminary Injunction

Pursuant to Federal Rule of Civil Procedure 65(b), a court may grant a preliminary injunction to prevent "immediate and irreparable injury." A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (citation omitted). To obtain such relief, a plaintiff "must show that: (1) [they are] likely to succeed on the merits, (2) [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [their] favor, and (4) an injunction is in the public interest." Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015) (citation omitted).

The Ninth Circuit recognizes a "sliding scale" variant of the Winter standard, where a strong showing of one factor can offset a weaker showing of another factor. See All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). According to this test, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135 (quotation marks omitted). A "serious question" is one on which the movant "has a fair chance of success on the merits." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984).

///

1    **V.    DISCUSSION**

2    **A.  Jurisdiction**

3    As a threshold matter, the Court addresses Respondents assertion that jurisdiction stripping

4    provisions of the INA, 8 U.S.C. § 1252(a)(2)(B)(ii), and the APA, 5 U.S.C. § 701(a)(2), preclude

5    judicial review of Petitioners' claims. In evaluating the application of these jurisdiction provisions,

6    the Court is guided "by the general rule to resolve any ambiguities in a jurisdiction-stripping statute

7    in favor of the narrower interpretation, and by the strong presumption in favor of judicial review."

8    Ibarra-Perez v. United States, 154 F.4th 989, 995–96 (9th Cir. 2025) (quoting Arce v. United

9    States, 899 F.3d 796, 801 (9th Cir. 2018) (*per curiam*) (internal quotation marks omitted) (citations

10    omitted)). Moreover, there is a "presumption favoring judicial review of administrative action."

11    Singh v. Barr, 982 F.3d 778, 781 (9th Cir. 2020) (quoting Kucana v. Holder, 558 U.S. 233, 251

12    (2010)). "When a statute is reasonably susceptible to divergent interpretation, we adopt the reading

13    that accords with traditional understandings and basic principles: that executive determinations

14    generally are subject to judicial review.'" Id. (internal quotation marks and citation omitted). "It

15    takes 'clear and convincing evidence' to dislodge this 'well-settled' presumption." Id. (quoting

16    Kucana, 558 U.S. at 251–52); see also Guerrero-Lasprilla v. Barr, 589 U.S. 221, 229 (2020) (The

17    presumption of reviewability has been "consistently applied" to immigration statutes and can be

18    overcome only by "clear and convincing evidence of congressional intent to preclude judicial

19    review.") (quotation marks omitted). Moreover, "[w]here Congress intends to preclude judicial

20    review of constitutional claims its intent to do so must be clear." Ibarra-Perez, 154 F.4th at 995-

21    96 (citing Webster v. Doe, 486 U.S. 592, 603 (1988).

22    Under 8 U.S.C. § 1252(a)(2)(B)(ii), "no court shall have jurisdiction to review … any other

23    decision or action of the Attorney General the authority for which is specified under [8 U.S.C. §§

24    1151-1378] to be in the discretion of the Attorney General . . ." Spencer Enters., Inc. v. United

25    States, 345 F.3d 683, 688-92 (9th Cir. 2003) (alterations in original) (quoting 8 U.S.C. §

26    1252(a)(2)(B)(ii)). Section 1252(a)(2)(B)(ii) does not bar review over all discretionary decisions,

27    rather it applies only where the Attorney General's discretionary authority is "specified" in the

28    statute in question. See id. at 689. Specifically, for subsection (ii) to apply, "the language of the

statute in question must provide the discretionary authority." <u>Id.</u> Moreover, the "authority" to act must be in the discretion of the Attorney General, meaning that "the right or power to act is entirely within his or her judgment or conscience." <u>Id.</u> at 690. To bar review, the statute must give the Attorney General "pure discretion, rather than discretion guided by legal standards." <u>Id.</u>

Similarly, the APA precludes review of "matters committed to agency discretion by law." <u>See</u> 8 U.S.C. § 702(a)(2). "Section 701(a)(2)'s exception for action committed to agency discretion is read 'quite narrowly.'" <u>Johnson Tr. of Charley E. Johnson Revocable Living Tr. v. United States</u>, 145 F.4th 1158, 1163 (9th Cir. 2025) (quoting <u>Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.</u>, 586 U.S. 9, 23 (2018)). "[A]gency action is 'committed to agency discretion' only in 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" <u>Id.</u> (quoting <u>Dep't of Com. v. New York</u>, 588 U.S. 752, 772 (2019)). In other words, "judicial review is unavailable when there is 'no law to apply.'" <u>Id.</u> (quoting <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 410 (1971)).

Accordingly, the applicability of 8 U.S.C. § 1252(a)(2)(B)(ii) and 5 U.S.C. § 701(a)(2) turns on whether Petitioners' challenge decisions by DHS that are committed to agency discretion by statute. Certainly, § 1182(d)(5) vests discretionary authority in the Secretary to grant parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and to revoke parole "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." 8 U.S.C. § 1182(d)(5). However, this discretionary determination is limited: "[t]he statutory and regulatory provisions governing the grant of parole provide for the revocation of parole when it no longer serves its purpose." <u>Hassan v. Chertoff</u>, 593 F.3d 785, 789 (9th Cir. 2010) (citing 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i)). Thus, "immigration officials clearly have the authority to deny parole to unadmitted aliens *if they can advance a facially legitimate and bona fide reason for doing so*." <u>Nadarajah v. Gonzales</u>, 443 F.3d 1069, 1082 (9th Cir. 2006) (quoting <u>Jean v. Nelson</u>, 472 U.S. 846, 853 (1985) (emphasis added).

Similarly, there are mandatory procedures for the revocation of parole: "upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of

the [designated officials], neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States, parole shall be terminated *upon written notice* to the [noncitizen] and he or she will be restored to the status that he or she had at the time of parole." 8 C.F.R. § 212(e)(2)(i) (emphasis added). As such, the question of whether parole is properly revoked pursuant to statutory and regulatory requirements, *i.e.* whether "[t]he revocation was lawfully authorized" is a predicate determination before a court can properly conclude that it lacks jurisdiction to review the revocation. See Hassan, 593 F.3d at 789-90. Accordingly, the Court has jurisdiction to resolve Petitioners' claim that their parole was revoked in violation of the mandatory procedural requirements provided by statute and regulation.

Finally, in a habeas challenge under § 2241, § 1252(a)(2)(B)(ii) "does not limit habeas jurisdiction over questions of law" or "constitutional claims." Hernandez v. Sessions, 872 F.3d 976, 988 (9th Cir. 2017) (quoting Singh v. Holder, 638 F.3d 1196, 1202 (9th Cir. 2011), nor over mixed questions of law and fact. Martinez v. Clark, 124 F.4th 775 (9th Cir. 2024) (citing Wilkinson v. Garland 601 U.S. 209 (2024). As such, "[a]lthough the INA precludes direct review of discretionary decisions, it does not bar [courts] from reviewing predicate legal questions." Gebhardt v. Nielsen, 879 F.3d 980, 985 (9th Cir. 2018) (citation modified).

To summarize, courts retain "jurisdiction to decide a 'purely legal question' that 'does not challenge the Attorney General's discretionary authority . . . even if the answer to that legal question . . . forms the backdrop against which the Attorney General later will exercise discretionary authority.'" Ibarra-Perez,154 F.4th at 996 (quoting United States v. Hovsepian, 359 F.3d 1144, 1155 (9th Cir. 2004)). Moreover, in cases where a noncitizen challenges the Attorney General's arguably discretionary decision on a purely legal basis as a "violation [of] the Constitution" or "INA," courts have jurisdiction to review such decisions as "premised on a lack of legal authority." Id. at 998. Because Petitioners assert that the revocation of their parole and detention violate statutory and regulatory requirements and the Due Process Clause, neither the jurisdiction stripping provision of the INA, § 1252(a)(2)(B)(ii), nor, by extension, of the APA, 8 U.S.C. § 702(a)(2), preclude judicial review here.

///

### B. Administrative Exhaustion

Respondents assert Petitioners have failed to exhaust their administrative remedies because they have appeals before the BIA regarding the dismissal of their removal proceedings, and therefore the Court should deny their habeas Petition as a matter of law.[5] See Resp'ts' Opp., ECF No. 16 at 20. However, the lawfulness of DHS' revocation of Petitioners' parole and detention of Petitioners is not at issue in those appeals—rather, the distinct question pending before the BIA of whether the IJ properly granted the government's motion to dismiss Petitioners' removal proceedings is not before this Court. And in case, it appears those appeals are moot after the government filed a motion to remand and proceed with Petitioners' removal proceedings as originally initiated prior to the IJ's dismissal order. Accordingly, because Respondents identify no administrative appeal process in which Petitioners could seek adjudication of their claims regarding the unlawful revocation of their parole and unlawfulness of their ongoing detention, administrative exhaustion is excused as futile. See, e.g., Sola v. Holder, 720 F.3d 1134, 1136 (9th Cir. 2013) (explaining that only procedural errors reviewable and correctable by the administrative tribunal must be exhausted) (citation omitted).

Moreover, requiring Petitioners to remain in unlawful detention pending a BIA decision would cause irreparable harm which is a separate basis to excuse administrative exhaustion. See Laing v. Ashcroft, 370 F.3d 994, 1000 (9th Cir. 2004) (administrative exhaustion is excused if irreparable injury would result from pursuit of administrative remedies); see also Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013) (finding irreparable harm in continued detention of noncitizens who would likely be granted conditional release if afforded a bond hearing). Accordingly, the Court declines to require administrative exhaustion in this case.

///

---

[5] Respondents also argue that Petitioners are impermissibly seeking universal relief on behalf of a putative class. See Resp'ts' Opp., ECF No. 16 at 19. However, this is not a class action, and Petitioners only seek habeas relief from unlawful detention on behalf of themselves individually. See Pet'rs' Verified Pet., ECF No. 1 at 29 (prayer for relief seeking "a writ of habeas corpus ordering Petitioners' immediate release from detention, or in the alternative, requiring that an Immigration Judge schedule a bond hearing within seven days"). Therefore, the Court need not address this argument.

C.  **Likelihood of Success on the Merits**

Turning to the "most important" factor governing the issuances of preliminary injunctive relief, see Garcia, 786 F.3d at 740 (citation omitted), the Court finds Petitioners are likely to succeed in showing that their ongoing detention is unlawful due to the failure of DHS to revoke their parole consistent with statuary, regulatory, and constitutional requirements.

1.  **APA**

Petitioners assert that their detention is "in violation of the . . . laws . . . of the United States," namely, the Administrative Procedures Act. See 28 U.S.C. § 2241(c)(3). Under the Administrative Procedure Act, this Court *must* find that certain actions by administrative agencies are unlawful. By way of background, "the APA sets forth the procedures by which federal agencies are accountable to the public and [are] subject to review by the courts." Franklin v. Mass., 505 U.S. 788, 796 (1992). As relevant here it requires this Court to "hold unlawful . . . agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). For the following reasons, the Court finds that the termination of Petitioners' parole statuses is likely unlawful under at least two of these provisions.[6]

i.  ***Procedure Required by Law***

First, Respondents have not followed their own binding regulation in their attempts to terminate Petitioners' parole statuses. "A federal agency . . . is 'obliged to abide by the regulations it promulgates.'" Backcountry Against Dumps v. Fed. Aviation Admin., 77 F.4th 1260, 1267 (9th Cir. 2023) (citations omitted). "This is especially true '[w]here a prescribed procedure is intended to protect the interests of a party before the agency.'" Id. (citations omitted). "Stated another way, it is absolutely essential that responsible federal agencies must follow their own binding

---

[6] As discussed below, the Court concludes that Respondents' actions are unlawful under the APA because they violate procedure required by regulation and the Constitution. Accordingly, the Court does not reach the issue of whether they are also arbitrary and capricious for purposes for the APA.

procedures." Id. (citations omitted). To recap, DHS *must* provide written notice[7] to a noncitizen to prematurely terminate their parole status. See supra Part III.A. Based on the record before this Court, Respondents have failed to do just that. From the outset of this case, Petitioners have maintained that their parole status has not been properly terminated because DHS failed to notify them of any change in their status. In response, Respondents argue that DHS provided adequate notice through: (i) the Federal Register and (ii) Petitioners' USCIS accounts. See ECF Nos. 16, 17; see also The CHNV Notice. The Court finds Respondents assertions fail to satisfy the written notice requirement and contradict the record before this Court.

First, Respondents cannot satisfy 8 C.F.R. § 212.5(e)(2)(i) by publishing a mass notice in the Federal Register. Generally, "the plain meaning of a regulation governs" its demands. See Munoz v. Mabus, 630 F.3d 856, 862 (9th Cir. 2010) (citations omitted). The regulation here is clear: DHS may prematurely terminate a noncitizen's parole status by supplying "written notice *to the [noncitizen]*." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added). In short, § 212.5(e)(2)(i) expressly requires DHS to provide written notice directly to a noncitizen. See Doe, et al. v. Noem, et al., No. 1:25-cv-10495-IT, 2026 WL 77330, at *2 (D. Mass. Jan. 10, 2026) (unpublished disposition). "This indicates the notice must be directly communicated to the parolee." Id. Respondents cannot clear this hurdle by providing constructive notice via publication in the Federal Register. This thwarts the regulatory requirement of notice "to the [noncitizen]," a procedural requirement which this Court finds "is intended to protect the interests of" noncitizens affected by the agency action, see Backcountry, 77 F.4th at 1267, as the affected individual has neither knowledge nor an opportunity to address a mass communication of which they are unaware. And the implications

---

[7] Petitioners maintain that the INA, and its implementing regulation, also require DHS to provide written notice explaining the basis for their individualized determination to terminate a noncitizen's parole status. See, e.g., ECF No. 2-1 at 14 ("To properly revoke parole, the government must provide written notice and make an individualized finding as to why humanitarian parole no longer serves its purpose in a specific case."). Since the Court finds Respondents have not met the threshold requirement of individualized written notice, the Court does not reach this issue. Nonetheless, the Court notes that district courts across the Ninth Circuit have persuasively found that the INA requires a case-by-case determination and notice regarding the basis for that determination to properly terminate a noncitizen's parole status. See, e.g., Y-Z-L-H, 792 F.Supp.3d at 1138 ("Further, the Supreme Court has stated that under [8 U.S.C. § 1182(d)(5)], immigration officials must make individualized determinations of grants of parole. Common sense suggests . . . that parole given only on a case-by-case basis is to be terminated only on such a basis.") (citation and quotation marks omitted).

are grave where the CHNV Notice provides parolees only 30 days to exit the country or their presence would become unlawful.

Second, Respondents have not supplied *any* evidence of individual notifications regarding the termination of Petitioners' parole statuses, whether via their USCIS accounts, email, or otherwise. See supra Part III.B.iv. Respondents have had an abundance of time to do so. Nearly two months ago, this Court ordered Respondents to "supply . . . evidence of any notice that was issued to Petitioners regarding the termination of their parole statuses." ECF No. 17. Instead, Respondents regurgitated an *unverified* brief they had already filed, and the only evidence they proffered was the original Notices to Appear served on Petitioners which commenced their removal proceedings upon their entry into the country in 2024. See supra Part II. This record leads the Court to an inescapable conclusion: those notifications do not exist. Otherwise, Respondents surely would have produced them by now. Indeed, in this habeas proceedings Respondents are obliged to provide "some fact upon which a reasonable person could logically conclude" that their decision to detain Petitioners complies with statutory and regulatory requirements, and their response is "insufficient unless it is supplemented by affidavits or with evidence at the habeas corpus hearing." See Carlson, 186 F.2d at 189 ("The imagination can hardly create a situation more incompatible with the spirit of our institutions than that one civil official's completely secret viewpoint could be the basis of sustained imprisonment."); see also Harris, 394 U.S. at 291–92 (citation omitted) (emphasizing that in habeas proceedings "the fact that the petitioner, being in custody, is usually handicapped in developing the evidence needed to support in necessary detail the facts alleged in his petition," and that courts must develop the factual record accordingly).

With regards to Petitioner L.M.'s memory of a mass email sent to him on or about April 16, 2025 stating that his parole was revoked, the Court concludes the email was likely erroneously sent to him, given Respondents' assertion that the email was tied to the termination of parolees under the CHNV program as reflected in the CHNV Notice in the federal register. Petitioner L.M. is not a parolee under the CHNV program as a citizen of Ecuador. Accordingly, any such mass email purportedly sent to Petitioner illustrates the failure of the government to provide individualized notice to him as required by regulation.

### ii.  *Contrary to Constitutional Right*

Finally, as discussed below, the Court concludes that Respondents' attempts to terminate Petitioners' parole statuses and their ongoing detention of Petitioners without meaningful notice or an opportunity heard likely violates the Due Process Clause of the Fifth Amendment. See infra Part V.B.2. Since Respondents' actions are likely "contrary to [Petitioners'] constitutional right[s]," then this Court must find that they are likely unlawful under the APA. See 5 U.S.C. § 706(2)(B).

### 2.  Due Process

Respondents provide no response to Petitioners' due process challenge to the revocation of their parole and their ongoing detention. As discussed below, the Court finds Petitioners are being detained in violation of their due process rights.

The Due Process Clause protects all persons in the United States, including noncitizens, from deprivations "of life, liberty, or property" by the federal government "without due process of law[.]" U.S. Const. amend V; see also Zadvydas v. Davis, 533 U.S. 678, 690 (2001). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." Zadvydas, 533 U.S. at 690. There is no question these protections extend to noncitizens present in the U.S. like Petitioners. See id. at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). "[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process." Hernandez v. Sessions, 872 F.3d 976, 981 (9th Cir. 2017). As the Ninth Circuit stated in considering a constitutional challenge to mandatory detention under the INA, "[w]e have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of liberty would have thought so. Arbitrary civil detention is not a feature of our American government." Rodriguez v. Marin, 909 F.3d 252, 256-57 (9th Cir. 2018).

To determine what procedures are constitutionally sufficient to protect a liberty interest,

the Court applies the three-part test established in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976). <u>See</u> <u>Rodriguez Diaz v. Garland</u>, 53 F.4th 1189, 1206–07 (9th Cir. 2022) (Applying the <u>Mathews</u> test to a procedural due process challenge to detention under § 1226(a) of the INA, because "<u>Mathews</u> remains a flexible test that can and must account for the heightened governmental interest in the immigration detention context."). The <u>Mathews</u> test balances three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335. The Court finds each of these three factors weigh in favor of Petitioners' claims that they are entitled to additional process prior to the revocation of their parole and the deprivation of their liberty. More specifically, the Court finds that Petitioners must be given "the opportunity to be heard at a meaningful time and in a meaningful manner" and that their ongoing detention without such process violates the Constitution. <u>Id.</u> at 333.

First, the Court finds the private interest affected by DHS' revocation of parole is their liberty interest in being free from imprisonment, "the most elemental of liberty interests." <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, 529 (2004). Even when the government has discretion to detain an individual, its subsequent decision to release the individual creates "an implicit promise" that they will be re-detained only if they violate the conditions of his release. <u>Morrissey v. Brewer</u>, 408 U.S. 471, 482 (1972). Parole, as a form of conditional release "is valuable and must be seen as within the protection of the [Due Process Clause]." <u>Id.</u> The liberty of a noncitizen released pending removal proceedings, "although indeterminate, includes many of the core values of unqualified liberty[.]" <u>Id.</u> Paroled noncitizens "can be gainfully employed and [are] free to be with family and friends and to form the other enduring attachments of normal life." <u>Id.</u> The termination of that liberty would "inflict[ ] a 'grievous loss'" both on noncitizens and their loved ones. <u>Id.</u> Here, Petitioners did not violate the conditions of their parole—rather, they developed community and financial ties to the United States and pursued the purpose of their parole by applying for asylum. Their liberty interest in remaining free from detention consistent with the terms of their parole thus

weighs heavily in their favor. See, e.g., Ramirez Tesara v. Wamsley, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025) ("When he was released from his initial detention on parole, Petitioner took with him a liberty interest which is entitled to the full protections of the due process clause.") (collecting cases).

That the express terms of Petitioners' parole allowed for discretionary termination or expiration does not somehow obviate the need for the government to provide an individualized hearing prior to detaining the parolee. See id. (quoting Pinchi v. Noem, 792 F. Supp. 3d 1025 (N.D. Cal. 2025) ("[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody, she has a protected liberty interest in remaining out of custody") (collecting cases). As parole is granted based on individualized considerations "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," see 8 U.S.C. § 1182(d)(5)(A), such a requirement prevents an erroneous or arbitrary revocation of parole that fails to consider the purposes for which it was granted and whether they have in fact "been served." Id. Here, the Court notes that Respondents' asserted but unverified parole termination is inconsistent with Petitioners' grant of parole in 2024 for the humanitarian purposes of allowing them to seek asylum. Respondents have not explained how that purpose "has been served," id., such that Petitioners should now be detained after they have established deep ties to the community, maintained employment, and timely filed asylum applications. See, e.g., Y-Z-L-H, 792 F. Supp. 3d at 1147 (noting that such discrepancy without consideration of the requirements of constitutional due process may be considered an arbitrary and capricious decision, subject to challenge under the APA). The Court thus finds that the first Mathews factor weighs strongly in Petitioners' favor.

The next Mathews factor, the risk of erroneous deprivation, is extraordinarily high where Petitioners are detained pursuant to the revocation of their parole without pre-deprivation notice and a hearing. The Due Process Clause typically "requires some kind of a hearing before the State deprives a person of liberty." Zinermon v. Burch, 494 U.S. 113, 127 (1990) (emphasis added). Respondents have provided no reason to depart from this rule with regards to their detention of Petitioners.

With regards to the discretionary grant of parole under 8 U.S.C. § 1182(d)(5)(A), neither the statutory provision or its enacting regulations provide any procedure for a noncitizen to challenge the revocation or expiration of parole as based on an erroneous factual or legal predicate, as unreasonable, or as otherwise in violation of statutory and regulatory requirements. See 8 C.F.R. § 212.5(e). Pursuant to regulation, where, as here, parole is terminated prior to its expiration date, if the previously paroled noncitizen cannot be excluded, deported, or removed "within a reasonable time," the noncitizen "shall again be released on parole unless in the opinion of the official . . . the public interest requires that the alien be continued in custody." Id., § 212.5(e)(2)(i). Yet there is no mechanism for a parolee to challenge the government's decision to return him to custody by ensuring, for example, that DHS had a reasonable basis for deciding that the public interest requires his continued detention. Moreover, if DHS made a mistake as to the identity of a noncitizen or as to facts erroneously applied to the noncitizen as a predicate for revoking parole and re-detaining a parolee, there is no mechanism for knowing and challenging the basis of that decision. This is illustrated by the fact that DHS apparently terminated Petitioner L.M.'s parole based on the CHNV Notice, even though he is a citizen of Ecuador, not Cuba, Haiti, Nicaragua, or Venezuela, and thus was not paroled through the CHNV program. This means that a noncitizen like Petitioner L.M. has no recourse to challenge his detention after parole revocation as based upon an erroneous or mistaken factual or legal predicate, or as otherwise arbitrary.

As to the probable value of additional procedure, it is not difficult to conclude that additional procedure is valuable where the only procedure required for the deprivation of Petitioners' liberty appears to be an unreviewable decision by an agency official subject to no formal procedures or review. Accordingly, the second Mathews factor also weighs heavily in favor of Petitioners' claim that they are entitled to meaningful notice and a hearing prior to the termination of their parole and deprivation of their liberty.

The third and final Mathews factor considers the government's countervailing interest in detaining Petitioners and the burden of a pre-detention hearing. Civil immigration detention is permissible only to prevent flight or protect against danger to the community, see Zadvydas, 533 U.S. at 690, but the government has provided no evidence—including in the proceedings before

this Court—that Petitioners ongoing detention serves either purpose. The record further reveals that the government would likely be unable to proffer evidence justifying Petitioners' detention on the basis that they are dangerous or a flight risk, because Petitioners have maintained a clean criminal record and were arrested and detained when they appeared for their immigrating hearings as required. The government "has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions." Hernandez, 872 F.3d at 994.

Nor can the government suggest that the cost of providing procedural protections to Petitioners would be fiscally or administratively onerous. If the government has a legitimate interest in detaining Petitioners, it need only provide a pre-deprivation hearing before a neutral decisionmaker where it can present evidence substantiating that legitimate interest. "In immigration court, custody hearings are routine and impose a minimal cost." Singh v. Andrews, No. 1:25-CV-00801-KES-SKO (HC), 2025 WL 1918679, at *8 (E.D. Cal. July 11, 2025). Indeed, it is likely that the cost to the government of detaining Petitioners pending removal proceedings would significantly exceed the cost of providing them with a pre-detention hearing. See Hernandez, 872 F.3d at 996 (Noting in 2017 that "the costs to the public of immigration detention are staggering: $158 each day per detainee, amounting to a total daily cost of $6.5 million. Supervised release programs cost much less by comparison: between 17 cents and 17 dollars each day per person.").

In conclusion, the Court finds that all three Mathews factors weigh in favor of Petitioners, and that they therefore have established a likelihood of success on the merits of their due process claim.

### D.  Irreparable Harm

As to the second Winters factor, Petitioners will undoubtedly continue to suffer irreparable harm in the absence of a preliminary injunction. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). Similarly, "in

cases involving a constitutional claim, a likelihood of success on the merits usually establishes irreparable harm." <u>Baird v. Bonta</u>, 81 F.4th 1036, 1048 (9th Cir. 2023). Hence, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold no further showing of irreparable injury is necessary." <u>Vasquez Perdomo v. Noem</u>, 148 F.4th 656, 689 (9th Cir. 2025) (citation omitted). Petitioners brings a constitutional claim which is likely to succeed on the merits. Accordingly, the Court finds that they have established irreparable harm.

### E. Balance of the Equities

The final two <u>Winter</u> factors—balance of the equities and consideration of the public interest—merge when the government is the party opposing a preliminary injunction. <u>See</u> <u>Padilla v. Immigr. & Customs Enf't</u>, 953 F.3d 1134, 1141 (9th Cir. 2020). These factors weigh heavily in Petitioners' favor. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." <u>Hernandez</u>, 872 F.3d at 996 (citing <u>Preminger v. Principi</u>, 422 F.3d 815, 826 (9th Cir. 2005)). Likewise, "neither equity nor the public's interest are furthered by allowing violations of federal law to continue." <u>Galvez v. Jaddou</u>, 52 F.4th 821, 832 (9th Cir. 2022) (holding that the district court did not abuse its discretion in finding the balance of hardships weighed in favor of plaintiffs who credibly alleged that the government was violating the INA). The minimal burden on the government of providing a pre-deprivation hearing, as compared to the preventable human suffering, *e.g.*, financial and emotional burdens on both Petitioners, their families, and their communities, in addition to the fundamental harm of arbitrary executive detention, demonstrates that the balance of the equities and public interest tip sharply in Petitioners' favor. <u>Hernandez</u>, 872 F.3d at 995-96 ("the public interest benefits from an injunction that ensures that individuals are not deprived of their liberty and held in immigration detention because of . . . likely unconstitutional process."). The third and fourth <u>Winter</u> factors therefore weigh sharply in favor of granting preliminary injunctive relief.

### F. Scope of Relief

Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." <u>E. Bay Sanctuary Covenant v. Biden</u>, 993 F.3d 640, 680 (9th Cir. 2021) (citation modified). "Where relief can be structured on an individual basis,

it must be narrowly tailored to remedy the specific harm shown[.]" Id. (citation omitted). The federal habeas corpus statute "does not limit the relief that may be granted to discharge of the applicant from physical custody." Carafas v. LaVallee, 391 U.S. 234, 238 (1968). "Its mandate is broad with respect to the relief that may be granted." Id. "It provides that '[t]he court shall ... dispose of the matter as law and justice require.'" Id. (quoting 28 U.S.C. § 2243).

The Court finds that Petitioners request for immediate release is necessary to restore the status quo *ante litem*. This "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir. 1963)). The pending controversy stems from Petitioners arrest and detainment on May 20, 2025, when Petitioners presented to the Las Vegas Immigration Court. At that time, Petitioners continued to comply with the conditions of their parole which was not set to expire until 2026. Therefore, the Court will restore Petitioners their parole status and order their release from custody. Doing so will maintain the status quo *ante litem* and prevent irreparable harm while allowing for their claims to be adjudicated on the merits.

The Court will further enjoin the re-detention of Petitioners in connection with their current removal proceedings without leave of Court. The Court finds this relief is necessary based on the particular facts of this case, where Respondents have failed to provide any evidentiary support for their assertion that they provided written notice of parole termination to Petitioners, despite having been ordered to do so, nor have they proffered any legitimate interest in continuing to detain Petitioners.

**G. Bond**

Under Federal Rule of Civil Procedure 65(c), a court "may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court with discretion as to the amount of security required, if any.'" Johnson v. Couturier, 572 F.3d 1067, 1086 (2009) (quoting Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003)). "In

particular, 'the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'" Id. (citation modified) (quoting <u>Jorgensen</u>, 320 F.3d at 919). Respondents have not argued that releasing Petitioners will be costly. Therefore, the Court declines to impose bond.

## VI.   CONCLUSION

Therefore, **IT IS HEREBY ORDERED** that Petitioners' (ECF No. 2) Motion for Preliminary Injunction is **GRANTED**.

**IT IS FURTHER ORDERED** that Respondents must **IMMEDIATELY RELEASE** Petitioners from detention by no later than **12:00 p.m.** on **January 15, 2026**, subject to the conditions of their prior grants of parole. Respondents shall file a notice of compliance with this Order by **January 16, 2026**.

**IT IS FURTHER ORDERED** that Respondents are **ENJOINED** from re-detaining Petitioners in connection with their pending removal proceedings without leave of Court due to the likelihood of further detention based upon inaccurate or erroneous facts as demonstrated by the record here.

**IT IS FURTHER ORDERED** that on or before **January 21, 2026,** the parties shall file a stipulated briefing schedule on the merits of the (ECF No. 1) Petition.

**DATED:** January 14, 2026.

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**